**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| **LORA CLAY,** ) | **CIVIL ACTION NO:** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **COMPLAINT AND** |
| ) | **DEMAND FOR JURY TRIAL** |
| ) | |
| **MONTSHIRE ENDODONTICS, PLLC,** ) | |
| ) | |
| **Defendant.** ) | |

NOW COMES Lora Clay, Plaintiff in the above matter, and hereby files this Complaint against the above-named Defendant for wrongful discharge. Specifically, Montshire Endodontics, PLLC, wrongfully discharged Plaintiff from her employment as an operations manager in retaliation for Plaintiff's legitimate complaints regarding a hostile work environment and subsequent refusal to accept false allegations about her job performance in exchange for a positive job reference.

**JURISDICTION AND VENUE**

1. This Court has jurisdiction pursuant to 28 U.S. Code § 1332 because the amount in controversy is greater than $75,000.00, Plaintiff is a resident of Vermont, and Defendant is incorporated in New Hampshire.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events underlying Plaintiff's claims substantially occurred in this judicial district, and most of the witnesses are located in New Hampshire. The substantive laws of New Hampshire apply to this action.

## PARTIES

3. Plaintiff Lora Clay was, at all relevant times, a resident of Wilder, Vermont.

4. Defendant Montshire Endodontics, PLLC ("Montshire") was, at all relevant times, a professional limited liability corporation domiciled and incorporated in the State of New Hampshire. Its main office is in Lebanon, New Hampshire.

## STATEMENT OF FACTS

5. Plaintiff was hired by Montshire during 2004. Over the ensuing years she attained the position of Operations Manager. When Plaintiff was discharged in June of 2021, her annual salary and benefit package totaled approximately $112,000.00. She had become well respected amongst local dentists, helped develop a network of local dental offices that often referred patients to Montshire, and she regularly communicated with those offices regarding referrals and patient care.

6. In 2010, Dr. Timothy Meyers, DDS, purchased Montshire and became the managing member. He retained Plaintiff as Practice Manager, her position at the time. Plaintiff was responsible for overseeing support staff and dental assistants, maintaining the operating account and finances, dealing with human resource issues, and coordinating the establishment and management of a second office located in Barre, Vermont.

7. From 2010 through 2017, Plaintiff closely worked with Dr. Meyers and Montshire's endodontist associates. During that time there were no significant complaints regarding Plaintiff's work product or technological skills. She was consistently complimented for her efforts, and was never reprimanded, consulted, or notified of any workplace misconduct during that time.

8. Dr. Meyers often told Plaintiff that she was the sister he never had, and thanked her many times over the years for her efforts to help grow Montshire.

9. Mikilena Hall, DMD, joined Montshire as an associate in 2017. In 2018, she became a Montshire equity shareholder. Later that year, Dr. Hall took maternity leave.

10. While on maternity leave, toward the end of 2018, Dr. Hall told Plaintiff that Montshire money was "missing," and that Plaintiff was responsible for the "missing" funds. The allegations were false, and there was no rational basis for Dr. Hall to believe them. During a subsequent meeting regarding the allegation, after Plaintiff voiced a grievance, Dr. Meyers chastised Dr. Hall for the false allegations and directed her to apologize to Plaintiff for the allegation, which Dr. Hall obliged.

11. During early 2019, shortly after Dr. Hall returned from maternity leave, she began working more closely with support staff and marginalizing Plaintiff's supervisory role. Plaintiff, who supervised the support staff, noticed that they grew abrasive and began ignoring Plaintiff's directions. Further, support staff had become increasingly insubordinate and frequently cursed at Plaintiff when she did attempt to discuss issues regarding the execution of their responsibilities. Plaintiff did not experience such adversity before Dr. Hall's false accusation and Plaintiff's subsequent complaint to Dr. Meyers.

12. By the summer of 2019, tensions between Plaintiff, Dr. Hall and other support staff reached a level that caused Montshire to hire an office consultant to assess the interpersonal dynamics of the practice. In August of 2019, Plaintiff complained again to Dr. Meyers about the interoffice tension Dr. Hall engendered, but stated that she would discuss it further with the consultant.

13. After two months of investigation and meetings, Dr. Meyers revealed to Plaintiff that the consultant determined Dr. Hall and other support staff were responsible for the office discord. Dr.

Meyers explained in text messaging that he and Plaintiff were "the only ones who are honest," that "[t]hey all lie to us and that is why we are soooo confused."

14. With particular regard to Dr. Hall, Dr. Meyers wrote that she is "a liar" and "doesn't respect anyone but herself," that "[s]he has a superpower to justify anything," and "smiles to everyone's faces and then complains about them behind their backs." He wrote that he and Plaintiff were "done" being Dr. Hall's "puppets."

15. Beginning in 2019, Montshire received complaints from other local dental offices about the quality of care Dr. Hall provided to patients they referred to Montshire. One of these dentists was Plaintiff's significant other, well known to the Montshire endodontists, who began asking that his patients be treated only by Dr. Meyers. Plaintiff has also reported to Dr. Meyers at least two instances of what was believed to be substandard care that Dr. Hall provided to patients.

16. Dr. Hall confronted Plaintiff about why Plaintiff's significant other was no longer referring patients to her. Plaintiff repeatedly told Dr. Hall it was not appropriate to question her about such referrals, and that she should speak with the dentist herself. Plaintiff also grieved these confrontations to Dr. Meyers, who indicated he "will talk to [Dr. Hall] about it. I don't think I can change who and what she is. Just protect myself from it." Approximately one week later, he lamented that "she just doesn't get it. And I'm so tired of trying to tell her."

17. In mid-December of 2019, another employee – Rachel – complained about Dr. Hall's hostility. Dr. Meyers explained to Plaintiff that he told Rachel, "all I can say is… [Dr. Hall] is a jerk." He then wrote Plaintiff that he was "[n]ot defending [Dr. Hall] anymore."

18. By March of 2020, Dr. Hall attempted to place blame on Plaintiff for what Dr. Hall labeled a "toxic" environment amongst support staff. Dr. Meyers looked into the matter and informed Plaintiff that the environment was not "toxic" – that "they all seem happy as clams out there."

19. During August of 2020, Dr. Hall wanted certain employees to have broader access to Endo Vision, Montshire's practice management platform that stores sensitive patient care information. Dr. Hall accused Plaintiff of telling Montshire's technology consultant, Infocus Consultant Services ("Infocus"), to disregard the request and not grant those employees access to Endo Vision.

20. Mark Schedler, Infocus's Montshire technology consultant, subsequently informed Montshire that Plaintiff did not tell him to ignore any of Dr. Hall's requests or to deny anyone access to Endo Vision. Dr. Meyers reprimanded Dr. Hall for the false accusation and advised Plaintiff to expect an apology from Dr. Hall. Plaintiff never heard anything further regarding the false allegation.

21. During late October, 2020, Dr. Hall again confronted Plaintiff about Plaintiff's significant other not referring patients to Dr. Hall. Again, Plaintiff explained that she did not want to be in the middle of their professional dispute. Dr. Hall expressed displeasure with Plaintiff's position and unwillingness to become involved.

22. On November 9, 2020, unable to withstand the continued hostility from Dr. Hall and the support staff Dr. Hall supervised, Plaintiff resigned and packed her belongings. Before she left, Drs. Meyers and Hall requested a meeting, and Plaintiff obliged.

23. During the meeting Plaintiff stated that she could no longer function in what had become a very distressing and hostile workplace. Plaintiff cited Dr. Hall's false allegations, harassment regarding Plaintiff's significant other, and continued undermining of Plaintiff's ability to properly supervise and direct support staff. Plaintiff stated she could no longer tolerate being cursed at and ignored by those she and Dr. Hall supervised. Plaintiff also mentioned the tension and hostility between Drs. Hall and Meyers, and the untenable position this placed her in while trying to communicate and manage their office.

24. Instead of accepting the resignation, Drs. Hall and Meyers pleaded with Plaintiff to stay. They apologized for the prior accusations by Dr. Hall and their failure to effectively mediate and ameliorate the hostility within the workplace. They also said they were in the process of making changes and that they needed and wanted her to remain with Montshire. Ultimately, they requested she reconsider her decision. They expressed their desire for her to continue leading Montshire in its efforts to expand its practice and offices to other areas in Vermont and New Hampshire. They advised that the changes would mean a new position for Plaintiff, as well as a raise. They also stated that her work could largely be done from a home office, which they also offered to equip.

25. Plaintiff agreed that working offsite might ameliorate some of the day-to-day tension she experienced and had come to dominate the work environment over the preceding two years. She agreed to remain with Montshire and awaited a formal written offer while working in her existing position.

26. Montshire created a new position for Plaintiff titled, "Operational Manager." The job description for the newly created position detailed the required "core competencies" as follows:[1]

- Adaptability
- Communication
- Planning and Organizing
- Problem Solving
- Excellent Customer Service
- Teamwork
- Time Management
- Detail Oriented
- Decision Making
- Negotiation
- Networking and Relationship Building
- Results Oriented
- Strategic Thinking

27. The job "duties" were extensive and, among other things, included the following:

---

[1] All excerpts from Montshire's Operational Manager job description appear in their original format.

6

• Responsible for understanding ALL business systems to oversee them
• Ensure all business operations are carried on in an appropriate, cost-effective way
• Improve operational management systems, processes, and best practices
• Formulate strategic and operational objectives
• Examine financial data and use them to improve profitability
• Manage budgets and forecasts
• Perform quality controls and monitor production KPls
• Conduct research to identify potential marketing opportunities and how to attract new patients
• Identify business opportunities, generate leads, and seek out partnership
• Negotiate rates and close deals with vendors
• Work with vendors and practice owners to oversee expansion projects and opening new locations
• Present new products, systems and services to enhance the practice
• Support the administrative and clinical team when patient issues have been escalated to you to minimize attrition
• Handle patient objections by clarifying information, emphasizing benefits, and working through differences to a positive conclusion and preserve
• Identify opportunities for marketing campaigns, community services and/or initiatives, and channels that will lead to increased revenue
• Use knowledge of the market and competitors to identify and develop the company's unique selling propositions and differentiators.
• Maintain extensive knowledge of current market conditions
• Review day sheets submitted by office managers to coordinate the data regarding referral sources, patient/insurance portions, and appropriate billing
• Support the office manager when mutually determining areas of growth and areas of improvement to develop necessary action plan
• Pull daily, weekly, and monthly reports and gather statistics
• Submit weekly progress reports, ensuring practice is working towards goals and staying within budget
• Produce production reports for the office and for each provider
• Produce office collection reports
• Produce aged receivables report {30,60, 90-day report)
• Produce report on number of new patients and their referral sources
• Support management, administrative, and clinical team to nurture and grow relationships with referring practices
• Bi-monthly meetings with owners to review progress, discuss outstanding issues, and develop action plans

7

    • Approved employee schedule and time clock entries will be submitted to you to process payroll by office managers
    • Support owners in performing salary increases based on management's recommendation of staff performance and growth
    • Maintain a high degree of interest in self-development, displaying this by making suggestions for realistic improvements
    • Accounts receivables and account payables
    • Demonstrate a team spirit and help create a positive work environment for the entire team
    • Communicate with retirement company and manage staff/doctor contributions and deferrals
    • Insurance payments to ledger
    • Reconciling all bank and credit card statements
    • Health plan administrator

28. The "requirements" for obtaining the position were listed as follows:

    • High school diploma or GED, or an acceptable combination of education and experience.
    • Postsecondary degree or diploma in business, marketing, economics, or a related field.
    • Proven understanding of the industry and area of service.
    • Excellent organizational, strategic planning, and implementation skills.
    • Ability to create realistic schedules and meet deadlines under stress and interruptions.
    • High level of critical and logical thinking, analysis, and reasoning to identify underlying principles, reasons, and facts.
    • Strong analytical and research skills.
    • Excellent interpersonal, communication, and relationship management skills.
    • Excellent attention to detail and a high degree of accuracy.
    • High level of integrity, confidentially, and accountability.
    • Ability to respond appropriately in high-pressure situations with a calm and steady demeanor.
    • A well-defined sense of diplomacy, including solid negotiation, conflict resolution, and people management skills.
    • Previous experience in practice management software such as Endovision is considered an asset.
    • Strong knowledge of general office procedures.
    • Able to write simple correspondence, including emails, memos, letters, etc.
    • General mathematical skills.
    • Adjusts and is flexible to meet changing work needs and demands.
    • Strong knowledge of Microsoft Office applications.
    • Ability to resolve personnel issues and mediate staff difficulties with or without assistance from the Dentist

29. Finally, there were three "Key Performance Indicators" associated with the position:

- Accuracy and report quality
- Meeting deadlines
- Revenue Growth and concentration

30. At no time prior to Montshire offering Plaintiff this position was she ever reprimanded, disciplined, demoted or provided notice for any alleged performance or workplace deficiencies.

31. On December 30, 2020, with the above the above competencies, duties, and requirements in mind, Montshire offered Plaintiff the Operational Manager because she already demonstrated that she fit the job description.

32. Plaintiff accepted and signed the offer, which incorporated the above job description, and her new annual salary of $93,006.78 was made retroactive to November 9, 2020, the date of the meeting regarding Plaintiff's attempted resignation.

33. Over the ensuing four months, Plaintiff's job responsibilities were delegated to others until she was left with little to no tasks. She was no longer being provided any direction or guidance by the partners on what she should be doing with her time. Whereas Plaintiff in the past was instructed to raise employment issues with Dr. Meyer, he instead redirected her to bring those to Dr. Hall.

34. Plaintiff attempted to speak with Dr. Hall about the ongoing elimination of her job responsibilities. However, Dr. Hall stopped communicating with Plaintiff.

35. On May 18, 2021, Montshire provided Plaintiff with a "Letter of Intent," requesting her resignation.

36. Montshire, which only four and one-half months earlier believed that Plaintiff possessed all of the "core competencies" and "requirements" of the Operational Manager position, was

somehow now "at a crossroads where we no longer consider you an asset to our team." Montshire falsely told Plaintiff that her "actions are working against our attempts to retain you on our staff."

37. Plaintiff was not reprimanded, cited, consulted, or alerted to any job performance issues whatsoever prior to her complaints on November 9, 2020 regarding a hostile workplace, or at any time after she accepted the Operational Manager position.

38. Montshire included within the "Letter of Intent" various false statements about Ms. Clay's job performance as Operational Manager: that she was given an opportunity to work remotely with goals to focus on and improve the quality and standard of her work; that Plaintiff had a history of "personal disagreements" with staff and management that led to staff electing to quit their positions; that she had somehow driven other employees and partners to quit; that she demonstrated she was uncomfortable using online systems and refused to work with a human resources third-party vendor; that she was not able to shift toward a paperless system of invoices and check drafting; that she did not respond to another employee's emails; and that she did not speak "equally" to the partners.

39. In exchange for Plaintiff's resignation, Montshire offered severance of three months' salary and benefits, and positive references for any future prospective employer.

40. The severance offer was expressly conditioned upon Ms. Clay's willingness to sign a non-disparagement agreement in favor of Montshire.

41. Unwilling to accept the false allegations in the severance offer, Plaintiff rejected the offer. Montshire terminated her six weeks later, on June 28, 2021.

42. Plaintiff subsequently filed for, and was granted, unemployment compensation. Montshire did not contest the claim.

## COUNT I
## WRONGFUL TERMINATION

43. Paragraphs 1 through 42 are hereby incorporated by reference.

44. Plaintiff's termination by Montshire was motivated by bad faith, malice, and was retaliation for Plaintiff's refusal to engage in conduct that public policy condemns, contrary to New Hampshire law. It was also motivated by an attempt to silence her regarding the office dysfunction and patient care issues about which she previously complained.

45. Public policy favors truthfulness. Requiring an employee to admit false allegations of workplace misconduct in exchange for money and a positive reference upon inquiry of other businesses extorts the employee and, when the misconduct allegations are true, deceives potential future dentistry or other potential employers who choose to inquire. Montshire's conduct in this case thus implicates and violates very important public policies. Montshire subjected Plaintiff to an ultimatum no employee should ever be required to face. She refused to be threatened and extorted into resignation, and was then subsequently fired for doing so.

46. No employee should face false accusations of poor work performance and an ultimatum to acquiesce to that false narrative in exchange for a positive job reference. A forced resignation of this sort coerces an employee to forego the benefits offered through New Hampshire's unemployment insurance program, such as temporary partial compensation and retraining. Rejection of such an offer carries the consequences of sudden loss of wages, no severance, and a decidedly negative job reference.

47. As a direct and proximate cause of Montshire's actions, Plaintiff has suffered and will continue to suffer lost wages and benefits in excess of $90,000.00, public humiliation and embarrassment, injury to her reputation, and emotional distress.

## COUNT II
## WRONGFUL TERMINATION

48. Paragraphs 1 through 47 are hereby incorporated by reference

49. Plaintiff's termination by Montshire was motivated by bad faith, malice, and was based on retaliation for Plaintiff raising reasonable concerns in November of 2020 about workplace harassment and a hostile work environment, contrary to New Hampshire law.

50. Montshire's actions after November 9, 2020, constituted adverse employment actions notwithstanding the purported promotion. Plaintiff was clearly promoted for the purpose of sanitizing a planned termination that was based on her complaints about the hostile workplace. Plaintiff's job responsibilities were immediately diminished following the promotion. She was shunned by Dr. Hall. Montshire then threatened Plaintiff with false allegations and a negative job reference to coerce and extort an admission to such false allegations. After Plaintiff refused, her employment was terminated on June 28, 2021.

51. As a direct and proximate cause of Montshire's actions, Plaintiff suffered lost wages and medical insurance benefits, public humiliation and embarrassment, injury to her reputation, and emotional distress.

WHEREFORE, Plaintiff demands the following relief:

    A. Compensatory damages deemed just and reasonable by a jury;

    B. Punitive damages due to the Defendants' intentional and malicious conduct;

    C. Lost wages and the value of lost benefits from June 30, 2021 through present;

D. Attorney's fees and costs as allowed by law; and

E. Any other relief deemed fair and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial as to all issues so triable.

Executed at Hartford, Vermont:

<u>June 9, 2023</u>       By:
Date

Respectfully submitted,
LORA CLAY

Brian R. Marsicovetere, Esq.
Counsel for Plaintiff
Marsicovetere and Levine Law Group, P.C.
128 Gates Street
PO Box 799
White River Junction, VT 05001
brian@rivercitylawyers.com
(802) 296-6200 ext. 109
NH Bar ID 14576

13